**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Xtreme Traffic Builders, Inc., a corporation, ) | |
| ) | |
| plaintiff, ) | |
| ) | |
| v. ) | Court No. 03 C 5732 |
| ) | |
| Global Financial Corp., Inc., a corporation, ) | Hon. Matthew F. Kennelly |
| and Damian Gonzalez, an individual, ) | |
| ) | Hon. Sidney I. Schenkier |
| defendants. ) | |
| DDD Enterprises, Inc., d/b/a Global ) | |
| Financial Enterprises, a corporation, ) | |
| ) | |
| counter-plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| Xtreme Traffic Builders, Inc., a corporation, ) | |
| Xtreme Traffic Builders, LLC, a limited ) | |
| liability company, ) | |
| ) | |
| counter-defendants. ) | |
| DDD Enterprises, Inc., d/b/a Global ) | |
| Financial Enterprises, a corporation, ) | |
| ) | |
| plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| Donald Druse, an individual, ) | |
| ) | |
| defendant. ) | |

## COUNTERCLAIM AND COMPLAINT

DDD Enterprises, Inc., d/b/a Global Financial Enterprises ("Global"), by its

undersigned attorneys, makes the following counterclaim against Xtreme Traffic Builders, Inc.

and Xtreme Traffic Builders, LLC (jointly "Xtreme") and complaint against Donald Druse:

## The Parties

1.      Global is an Illinois corporation with its principal place of business at 155 North Michigan Avenue, Suite 527, Chicago, Illinois 60601.  Prior to incorporation, it did business as "Global Financial Corp., Inc."

2.      Xtreme Traffic Builders, Inc. is a dissolved Illinois corporation with its principal place of business at 435 North LaSalle Street, Suite 400, Chicago, Illinois 60610. Xtreme was in the business of selling and producing direct mail pieces primarily for the automotive and mortgage industries.

3.      Upon information and belief, Xtreme Traffic Builders, LLC is an Illinois limited liability company and the successor to Xtreme Traffic Builders, Inc.

4.      Druse is an individual residing in Illinois.  He is the president of Xtreme and a member of XTB Financial, LLC, d/b/a Chicago Mortgage Acceptance ("CMA").

## Background Facts

5.      Damian "Jae" Gonzalez is a former employee of Xtreme and CMA.

6.      In or about July of 2003 Gonzalez left his employment at CMA and began, with others, to operate Global, a direct mail company.

7.      On August 15, 2003 Xtreme filed suit against Global and Gonzalez, alleging copyright infringement arising out of Global and Gonzalez' alleged reproduction and/or use of Xtreme's registered copyright, registration No. TX-700-257 (the "Lawsuit").

8.      On October 13, 2003 Xtreme, Global and Gonzalez entered into a settlement agreement (the "Agreement"), a copy of which is attached hereto as Exhibit A and incorporated by reference.

2

9.     Pursuant to the Agreement, Global and Gonzalez "agree[d] to use Xtreme or Xtreme's designee as their exclusive vendor for all of their requirements for direct mailgoods and services (except services to develop intellectual property used in such goods) during the [two year] term of the Agreement." Beginning three months after execution of the Agreement, Gonzalez and Global were required to make minimum purchases of 30,000 mailers per month from Xtreme. *See* Agreement, paragraph 6.

10.     A price list for Xtreme's goods and services was attached to the Agreement as Schedule A. For instance, according to that schedule, mortgage mailings described as "FHA tear-off with leads" was priced as 59.5¢ per mailing.

11.     On or about November 4, 2003, this Court entered an Agreed Order of Dismissal whereby the Lawsuit was dismissed with prejudice with this Court retaining jurisdiction to enforce the Agreement. On July 15, 2004 this Court reinstated the action pursuant to motion filed by Global.

## Jurisdiction and Venue

12.     Count I of this counterclaim is for breach of the Agreement by Xtreme. This Court has jurisdiction over this claim because it retained jurisdiction over the case to enforce the Agreement.

13.     Count II is for civil violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

14.     Counts III, IV and V are for common law tortious interference with prospective economic advantage and tortious interference with contract. This Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

3

15.    Venue is proper in this District pursuant to 28 U.S.C. 1391(b) because all defendants reside in this District and because all relevant acts occurred within this District.

### Count I–Breach of Contract

16.    Global incorporates paragraphs 1 through 15 as if fully set forth herein.

17.    At all times relevant to this complaint, the Agreement was a valid and enforceable agreement (subject to Global's potential right to seek rescision resulting from the lack of consideration given by Xtreme for the Agreement).

18.    Global and Gonzalez fully performed the Agreement (including placing $20,000.00 in escrow) until Xtreme materially breached the Agreement.

19.    Xtreme breached the Agreement and the covenant of good faith and fair dealing implied therein by:

a.    Causing significant delays in the processing of Global's orders such that Global lost significant sales and future business;

b.    Poorly handling Global's orders by doing such things as failing to contact the customer in a timely manner, rude handling of the customer, and providing the wrong product to the customer, such that Global lost significant sales;

c.    Placing its own name and not that of Global on some products ordered by Global;

d.    Refusing to process Global's orders placed for clients Novastar Mortgage ("Novastar") and Allied Mortgage Capital Corp. ("Allied");

e.    Threatening to put Global out of business by selling products to Global's customers at rates lower than Global was required to pay under the Agreement; and

f.    Appropriating Global's customer information and using it for Xtreme's own benefit.

4

20.     Following is a representative chart showing contract dates and clients of
Global, most of whom did not do future business with Global as a result of Xtreme's breach in
delaying processing of Global's orders for these clients:

| | |
|---|---|
| Bill White Auto Mall | January 12, 2004 |
| Head Financial | January 6, 2004 |
| AAA Mortgage Money | February 23, 2004 |
| Preferred Mortgage Lenders | February 19, 2004 |
| Harbor Tech Mortgage, Inc. | December 19, 2003 |
| Lincoln Mortgage | January 23, 2004 |
| Lynk Financial, Inc. | January 23, 2004 |
| Genesis Mortgage | December 31, 2003 |
| First Finance Mortgage | January 7, 2004 |
| First Fidelity Mortgage | January 8, 2004 |
| First Metropolitan Mortgage | January 16, 2004 |
| Brokers Mortgage | December 2003 |
| Bayer Motor Company | January 20, 2004 |
| Ridge Gate Mortgage | February 16, 2004 |
| Mortgage Mart | March 2, 2004 |
| Toyota of Richmond | February 6, 2004 |
| Priority Mortgage Company | February 20, 2004 |
| Accent Mortgage Service | January 27, 2004 |
| Basil Resale Transit | February 17, 2004 |
| Basil Resale Transit | January 13, 2004 |
| First Financial Corp. | January 13, 2004 |
| Citilend Mortgage | January 19, 2004 |

21.     As a result of these breaches by Xtreme, Global has been damaged in that it has lost sales in excess of $250,000, and suffered diminished good will with its customers.

22.     Xtreme's breach was malicious in that the frequency and scope make it evident that it was done with the intent to put Global out of business.

WHEREFORE, DDD Enterprises, Inc., d/b/a Global Financial Enterprises, requests that this Court grant judgment in its favor and against Xtreme Traffic Builders, Inc. and Xtreme Traffic Builders, LLC on Count I, award compensatory damages in an amount to be determined, return of all monies in the escrow account established pursuant to paragraph 5 of the Agreement, punitive damages, plus costs and whatever other relief the Court deems appropriate.

## Count II-Violation of RICO

23.     Global incorporates paragraphs 1 through 15 as if fully set forth herein.

24.     Druse is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

25.     Xtreme constitutes an enterprise within the meaning of 18 U.S.C. 1961(4) whose activities affect interstate commerce within the meaning of 18 U.S.C. 1962(b). Xtreme exists separate and apart from the pattern of racketeering activity alleged.

26.     Druse, during the past ten years, has engaged in two or more predicate acts of racketeering, as described more fully in the following paragraphs of this count. The ultimate purpose of the scheme was to extort money from Global.

### Predicate Acts of Racketeering

27.     On several occasions, Druse has used extortion to obstruct and affect commerce, with the specific intent and purpose of obtaining another's money by instilling fear in that person, which fear was reasonable. Each instance of such conduct is a violation of 18 U.S.C.

6

§ 1951 and a distinct predicate act of racketeering.  Druse's violations of 18 U.S.C. § 1951

include:

a.  On or about January 28, 2004 at the restaurant Tavern on Rush located at 1031 North Rush Street in Chicago, Illinois, Druse and Paul Duffie (Xtreme's vice president of sales) threatened physical violence and even to kill Gonzalez if Global did not stop selling mailers to clients Novastar and Allied.  Duffie then and there committed physical violence by grabbing and pushing Gonzalez.

b.  On April 20, 2004, at a meeting at the office of Xtreme, Druse threatened to stop the production of mailers ordered by Global under the Agreement and otherwise attempt to put Global out of business if Global did not agree to pay an additional 1½¢ per mailer ordered pursuant to the Agreement.  During this meeting, when Chris Bidigare (a consultant of Global and employee of Advantage Mortgage) attempted to leave the meeting room, Druse ordered Duffie to block Bidigare's exit.  Duffie then and there physically blocked Bidigare from leaving the room.

c.  On the evening of April 20, 2004 during a chance meeting at the Narcisse restaurant located at 710 North Clark Street in Chicago, Illinois, Druse told Gonzalez that he had not obtained enough from Global in the extortionate meeting described in subparagraph b above, and threatened Gonzalez that if Advantage Mortgage (an employer of Gonzalez) did not fire Brian McSweeny, a former Xtreme employee, Xtreme would steal all of Global's clients by offering mailers at a rate of 39¢ per piece, saying, "I'll 39 cent your [expletive for posterior]."  During this discussion, when Gonzalez attempted to leave, Druse roughly grabbed Gonzalez's arm and said, "we're not done talking."

d.  On April 21, 2004 at about 4:00 a.m., Druse left a telephone message for Duane Faul of Global, again threatening that if Advantage Mortgage did not fire McSweeny, Xtreme would put Global out of business by selling to all of Global's customers at 49¢ per mailer.

e.  On or about May 4, 2004, Druse called the offices of Global and spoke to Global receptionist, Iwona Burnat.  Druse asked to speak to Gonzalez or Bidigare.  When told they were unavailable, Druse stated, "are those [expletive gerund and expletive noun] afraid of

me? Don't make me come down there." Druse later appeared at the offices of Global with Duffie, Frank Colacine (a vice president of sales), Robert Hovey (vice president of marketing), and Michael Groh (CEO of CMA). Without being invited in, they entered the office of Global by using a door marked "Employees Only" and walked through the office with the clear intent of intimidating Global employees. This conduct was in furtherance of the plan to extort money from Global.

28.    Druse's conduct described in paragraph 26 above also violates Illinois' prohibition against intimidation (*i.e.*, extortion), 720 ILCS 5/12-6(4).

## Pattern of Racketeering

29.    Druse's numerous illegal acts in connection with his extortionate scheme, described in the preceding paragraphs, constitute predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) and were perpetrated for the same or similar purpose, and had similar results, participants, victims and methods of commission. The predicate acts of racketeering were related in their common objective of furthering the scheme to extort money from Global, and are capable of repetition.

30.    Druse's predicate acts constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because they were related and continuous. Each predicate act had the same or similar purpose and result (to extort money out of Global), overlapping participants (Druse and Duffie), the same victim (Global), and the same or similar methods of commission.

31.    There is open-ended continuity in the pattern of racketeering, as Druse has threatened to continue to steal Global's customers and put Global out of business unless Global complies with his extortionate demands. Thus, Global was and continues to be injured in its

8

business or property as a result of the predicate acts of racketeering. In fact, as a result of

Xtreme's threats, Global stopped selling mailers to Novastar and Allied to its detriment and to

Xtreme's benefit, and paid Xtreme an additional 1½¢ per mailer on several invoices following

April 20, 2004.

WHEREFORE, DDD Enterprises, Inc., d/b/a Global Financial Enterprises,

requests that this Court grant judgment in its favor and against Donald Druse in an amount three

times its damages, plus punitive damages, prejudgment interest, attorneys' fees, costs, and such

other relief as this Court deems appropriate.

### Count III–Tortious Interference With
### Prospective Economic Advantage With Customers

32.     Global incorporates paragraphs 1 through 15 as if fully set forth herein.

33.     Global had a reasonable expectation of entering into valid business deals

with Novastar and Allied whereby Global would sell those customers direct mail pieces.

34.     Xtreme and Druse knew of Global's expectancy to enter into these deals.

35.     Xtreme purposefully interfered and prevented Global's legitimate

expectancy from ripening into a valid business relationship by:

      a.     Physically attacking Gonzalez and threatening his life if Global
          continued to deal with Novastar and Allied; and

      b.     Refusing to process Global's orders placed for deals with Novastar
          and Allied.

36.     Both of the above-described actions were at the personal instruction of

Druse.

37.     Global was damaged by the interference of Xtreme and Druse in that it lost

significant sales to Novastar and Allied.

9

WHEREFORE, DDD Enterprises, Inc., d/b/a Global Financial Enterprises, requests that this Court grant judgment in its favor and against Xtreme Traffic Builders, Inc. Xtreme Traffic Builders, LLC and Donald Druse, jointly and severally, on Count III, award compensatory damages in an amount to be determined, punitive damages, plus costs and whatever other relief the Court deems appropriate.

### Count IV-Tortious Interference With
### Contractual Relations With Customers

38.     Global incorporates paragraphs 1 through 15 as if fully set forth herein.

39.     Global entered into one or more contracts with the following clients:

| | |
|---|---|
| Allied Home Mortgage | Academy Mortgage |
| Friendly Chevrolet | American Residential |
| Ameritex Mortgage | Novastar Home Mortgage (WI) |
| 1st Home Equity | Novastar Home Mortgage (CA) |
| Golden Eagle Mortgage | Marine Myers Automall |
| Anchor Mortgage | First Premier |
| AAA Highland Mortgage | Hanson Mortgage |
| First Rate Mortgage | Home Source Mortgage |
| Rodger-Fore Chevrolet | Mirad Financial Group |
| First Capital Mortgage | Mortgage Fixers |
| Full House Mortgage | Mornorth Mortgage |
| Capital West Financial | Choice Finance Corp. |
| First Choice Financial | Toyota of Richmond |
| Scott Pluff Ford Toyota | Ridge Gate Mortgage |
| Preferred Mortgage | AAA Mortgage Money |
| Premier Mortgage | Abbey Mortgage and Investment |

| Clair Jeep Buick | Heartland Mortgage |
|---|---|
| Budget Car Sales | American Mortgage |

40.     Xtreme and Druse knew of Global's contracts with these clients because Global submitted them to Xtreme as orders for processing under the Agreement.

41.     Xtreme and Druse intentionally and unjustifiably interfered with these contracts by delaying the processing of the deals such that the clients were unwilling to pay Global.

42.     Global also entered into contracts with Budget Car Sales and Baydo Chevrolet.

43.     Xtreme and Druse knew of Global's contracts with these clients because Global submitted them to Xtreme as orders for processing under the Agreement.

44.     Xtreme and Druse intentionally and unjustifiably interfered with these contracts by:

        a.     Being rude in dealing with the client in the processing of the order of Budget Car Sales, thereby causing the client to cancel; and

        b.     Sending the wrong product to Baydo Chevrolet, thereby causing the client to demand a refund.

45.     Global has been damaged by Xtreme's conduct by losing the above-described orders.

WHEREFORE, DDD Enterprises, Inc., d/b/a Global Financial Enterprises, requests that this Court grant judgment in its favor and against Xtreme Traffic Builders, Inc, Xtreme Traffic Builders, LLC. and Donald Druse, jointly and severally, on Count IV, award compensatory damages in an amount to be determined, punitive damages, plus costs and whatever other relief the Court deems appropriate.

11

### Count V–Tortious Interference With
### Prospective Economic Advantage With VLS and Alesco

46.     Global incorporates paragraphs 1 through 15 as if fully set forth herein.

47.     As of May of 2004, Global had an ongoing business relationship with VLS, a company which provided Global with direct marketing tools for its automotive business.

48.     As of June of 2004, Global had an ongoing business relationship with Alesco, a company which provided names or "leads" for its direct marketing business.

49.     Xtreme was aware of the fact Global had business relationships with VLS and Alesco.

50.     Xtreme is a large customer of VLS.

51.     Xtreme is a large customer of Name Seekers, a company which sells the names or "leads" to Alesco.

52.     Upon information and belief, in or about the end of May of 2004, Xtreme and Druse intentionally and unjustifiably interfered with Global's relationship with VLS and told VLS that if it did not stop selling to Global, Xtreme would no longer do business with VLS and would sue VLS.

53.     Upon information and belief, in or about the middle of July of 2004, Xtreme and Druse intentionally and unjustifiably interfered with Global's relationship with Alesco by contacting Name Seeker and urging Name Seeker to threaten Alesco that it would stop selling names to Alesco if Alesco continued to do business with Global.

54.     In or about June of 2004, VLS told Global it would no longer do business with Global.

12

55.     In or about the middle of July of 2004, Alesco warned Global that it may stop doing business with Global at any moment due to the threat of losing its right to buy names from Name Seeker.

56.     Global has been harmed by this conduct of Xtreme as without the products of VLS it can no longer conduct direct marketing in the automotive field, and with the threat of losing its ability to obtain names from Alesco, it may be unable to fulfill contracts with its customers.

WHEREFORE, DDD Enterprises, Inc., d/b/a Global Financial Enterprises, requests that this Court grant judgment in its favor and against Xtreme Traffic Builders, Inc, Xtreme Traffic Builders, LLC. and Donald Druse, jointly and severally, on Count V, award compensatory damages in an amount to be determined, punitive damages, plus costs and whatever other relief the Court deems appropriate.

GLOBAL DEMANDS TRIAL BY JURY

DDD Enterprises, Inc.,
d/b/a Global Financial Enterprises

By: _____
        One of its attorneys

Paul J. Kozacky
Jerome R. Weitzel
Paul J. Kozacky & Associates, P.C.
One North LaSalle Street, Suite 3150
Chicago, Illinois 60602
312-696-0900

## CERTIFICATE OF SERVICE

I, Paul J. Kozacky, an attorney, certify that I had a copy of this counterclaim and complaint served upon Gary S. Weiss and Timothy M. Kelly, 20 North Clark Street, Suite 2450, Chicago, Illinois 60602 by placing a copy in the U.S. Mail, properly addressed and postage prepaid, at One North LaSalle Street, Chicago, Illinois 60602 before the hour of 5:00 p.m. on July 26, 2004.

14

## SETTLEMENT AGREEMENT

This Agreement is entered into as of the 13th day of October, 2003 ("Effective Date") by and between Xtreme Traffic Builders, Inc. ("Xtreme" or "plaintiff"), with its principal place of business at 435 North LaSalle Street, Suite 400, Chicago, Illinois 60610 and Damian Gonzalez, a/k/a Jae Gonzalez ("Gonzalez") residing at 933 W. Van Buren, Chicago, Illinois and Global Financial Corp.(hereinafter sometimes referred to as "Global"), a corporation having its principal place of business at 350 5th Ave., Suite 3394, New York, NY 10118.

## WITNESSETH

WHEREAS, on August 15, 2003, plaintiff filed Civil Action No. 03 C 5732, entitled Xtreme Traffic Builders, Inc. v. Gonzalez, et al., in the United States District Court for the Northern District of Illinois, Eastern Division ("the Action") alleging, inter alia, copyright infringement arising out of defendant's alleged reproduction and/or use of plaintiff's registered copyright, registration no. TX5-700-257 issued January 24, 2003.

WHEREAS, the defendants deny liability for the claims asserted by plaintiff in its complaint as well as the factual and legal allegations upon which such claims are based;

WHEREAS, the parties are desirous of amicably resolving their dispute including the Action without the necessity of further litigation.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, receipt of which is acknowledged, the parties hereto intending to be legally bound hereby agree as follows:

1.    **Term.** This Agreement is effective on the Effective Date and shall continue in full force and effect for two (2) years unless earlier terminated in accordance with the provisions of this Agreement (the "Initial Term"). Thereafter, this Agreement shall renew


EXHIBIT A

automatically on its anniversary date for one (1) year terms (the "Renewal Terms") unless either party provides written notice to the other party thirty (30) days prior to the end of the Initial Term or any Renewal Term of its intent not to renew.

2.     **Cease and Desist.** Gonzalez and Global shall immediately cease and desist from the actions alleged in the complaint to comprise infringement of any and all of Xtreme's copyrights, patents, trademarks or trade secrets. Gonzalez's and Global's only use of any materials embodying Xtreme's copyrights, patents, trademarks or trade secrets shall consist of those materials they have purchased from Xtreme, provided that Gonzalez and Global shall compel and cause each and every employee, agent and officer of Gonzalez and/or Global to sign a statement acceptable to Xtreme acknowledging Xtreme's intellectual rights in such materials.

3.     **Employees.** Gonzalez shall not, and shall not assist anyone else to, solicit, interfere with, recruit, or in any way attempt to hire current or former employees or agents of Xtreme Traffic Builders and Chicago Mortgage Acceptance, to work for Garfield, Global, Gonzalez's business or any other entity, unless specifically authorized in writing by Xtreme, and subject to the condition that each such authorized person shall sign a statement acknowledging that such authority granted by Xtreme shall not be deemed a waiver of such person's other obligations to Xtreme prohibiting employment with any other competitor.

Gonzalez and Global further agree to compel and cause each and every present employee, agent and officer of Gonzalez and/or Global to sign a statement acknowledging that such employment shall not be deemed a waiver of such person's other obligations to Xtreme prohibiting employment with any other competitor.

2

Gonzalez and Global further agree to compel and cause each and every new employee, including Jae Gonzalez, to agree in writing, as a condition of employment, to a written prohibition, acceptable to Xtreme, against competing with Gonzalez, Global or their supplier Xtreme during their term of employment and for two (2) years thereafter.

4.    **Attorneys' Fees.** Gonzalez shall pay all of Xtreme's attorney's fees, legal costs, court costs, and expenses relating to his alleged infringement, including but not limited to, all legal fees relating to infringement issues regarding Garfield Mortgage, Midwest Mortgage, All Star Lending, Global Financial, Michael Boeing and Gonzalez, amounting to ten thousand, seven hundred fifty dollars ($10,750.00). Gonzalez shall pay for these legal fees by adding $.05 to the purchase price (as set forth on the attached Schedule A) of each and every mailer purchased by Gonzalez, for a minimum of three (3) months from the date this agreement is executed, until such sum is paid in full.

5.    **Retainer.** Gonzalez shall place $20,000 in escrow with an escrow agent approved by Xtreme in an account bearing commercially reasonable interest, to be funded and applied as follows:

a.    Gonzalez shall, simultaneously with the execution of this Agreement, place $5,000 in the above escrow account, and shall pay additional payments of $5,000 on the first day of November 2003, December 2003 and January 2004, respectively. For the December 2003 and January 2004 payments, Gonzalez may delay payment until no later than June 1, 2004, provided, however, that Gonzalez gives fourteen (14) days written notice prior to said respective due date, and that Gonzalez hereby agrees to pay a penalty of $0.05 per mailer for

3

each delayed payment for so long as each payment is so delayed. For example, at any time when Gonzalez is in arrears for both the December 2003 and January 2004 payments, his price shall be increased by $0.10 per mailer.

b.      This fund may be used by Xtreme for any legal fees relating to Gonzalez or any of his employers, employees, agents or assigns' future infringement of Xtreme copyrights, patents, trademarks or trade secrets.

c.      Xtreme may also use these funds to pay for legal services in the event any of Gonzalez's employers, employees, agents or assigns' accuse Xtreme of infringing any copyrights, patents, trademarks or trade secrets but shall be immediately refunded by Xtreme to the escrow account if Xtreme is found to have so infringed.

d.      Xtreme may also retain these funds to cover Gonzalez and Global's indemnification obligations as set forth in paragraph 8 and minimum purchase obligations as set for in paragraph 6, herein.

e.      Any remaining funds and accrued interest will be returned to Gonzalez two (2) years after the execution of this Agreement.

6.      **Product Pricing.** Gonzalez and Global shall purchase products from Xtreme as set forth on the attached Schedule A. Gonzalez and Global agree to use Xtreme or Xtreme's designee as their exclusive vendor for all of their requirements for direct mail goods and services (except services to develop intellectual property used in such goods) during the term of this Agreement. Beginning three months after the Effective Date, Gonzalez and Global shall purchase a minimum of 30,000 mailers per month from Xtreme.

4

7.     **Dismissal.** Xtreme will cause its Complaint to be dismissed within two (2) weeks of the execution of this Agreement and initial funding of the escrow account. Notwithstanding anything in Paragraph 9, The parties hereto agree that if defendants fail to make all timely payments as set forth in Paragraph 5a, plus a ten (10) business day grace period for late payment, plaintiff shall have the right to re-file and reinstate the Action.

8.     **Indemnification.** Gonzalez and Global, at their expense, shall defend and indemnify, and save and hold Xtreme harmless from and against any and all liabilities, claims, causes of action, suits, damages, including without limitation, suits for personal injury or death of third parties, and expenses, including reasonable attorneys' fees and expenses, for which Xtreme becomes liable, or may incur or be compelled to pay by reason of Gonzalez and/or Global's activities or breach of the terms of this Agreement, including but not limited to: (i) claims of infringement of any intellectual property right; or (ii) product liability suits by direct or indirect customers of Gonzalez and/or Global.

9.     **Release.** Upon dismissal of the Action unless the Action is reinstated pursuant to Paragraph 6, plaintiff and defendant will be deemed to have irrevocably released each other and any of their subsidiaries, affiliates, officers, directors, representatives and agents as to any and all claims arising out of the actions or conduct of the parties that occurred on or before the date the Court dismisses this Action. All parties hereto acknowledge that they know of no such other claims and defenses not already pleaded.

10.     This Agreement shall be binding upon and inure to the benefit of the parties hereto, and each of them, and each of their respective successors and assigns.

5

11.     This Agreement shall in all respects be interpreted, enforced and governed by and under the laws of the State of Illinois without regard to any conflict of law provisions thereof.

12.     This Agreement may be executed in counterparts, all of which, when taken together, shall constitute one agreement with the same force and effect as if all signatures have been entered into one document.

13.     This Agreement represents the entire agreement between the parties and may not altered, amended or modified, except in a writing signed by all parties.

14.     The parties represent and warrant that there has been no assignment or other transfer of any interest in any claims which they may have or may have had against each other, and they further agree to indemnify and hold each other harmless from any liability, claims, demands, damages, costs, expenses and attorneys' fees incurred by the other party as a result of any person asserting any such assignment or transfer.

15.     a. The parties hereto acknowledge that they have not executed this Settlement Agreement in reliance on any promise, representation or warranty except as expressly set forth herein and that this Settlement Agreement superseded all prior statements or agreements, both oral and written, to the extent any provision hereof is inconsistent with any such prior oral and/or written statements or agreements.

b.     If any provisions of this Settlement Agreement shall be deemed unenforceable for any reason, the remaining provisions will be given full force and effect.

16.     Notices. Any notices, demands or other communications required or permitted to be given by an provision of this Settlement Agreement shall be in writing and shall be (i)

6

delivered personally to the party or an officer of the party to whom the same is directed; and

(ii) sent by overnight mail addressed as follows:

If to Gonzalez:     Konstantine Sparagis
                    MORGAN & BLEY LTD.
                    900 West Jackson
                    Suite 4 East
                    Chicago, IL 60607

If to Xtreme:       Edward J. Chalfie
                    ARNSTEIN & LEHR LLP
                    120 S. Riverside Plaza
                    Suite 1200
                    Chicago, IL 60606

or to such other address as such any party may from time to time specified by written notice given in the manner provided above.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the Effective Date.

XTREME TRAFFIC BUILDERS, INC.          DAMIAN GONZALEZ, a/k/a JAE GONZALEZ

By:                          10/22/03                                  10/14/03
Name:
Title: President

                                       GLOBAL FINANCIAL CORP.

                                       By:
                                       Name: Damian J Gonzalez
                                       Title: President

## SCHEDULE A

The following represents the parties' Agreement as to the price and terms of sale from Xtreme to Gonzalez, of Xtreme's products:

7

1.      All pricing includes the costs for standard list and standard postage unless
otherwise indicated. All stated terms are as ordinarily understood by the parties hereto.
MINIMUM ORDER IS 2500 PIECES. Xtreme reserves the right to modify the prices in this list
if postage costs and/or Xtreme's suppliers' prices increase.

2.      For all purchases made by Gonzalez or any affiliated entity, the total purchase
price must be wired to Xtreme forty-eight (48) hours prior to Xtreme's mailing of the products
purchased.

3.      In the case of Fastrack transactions, Xtreme shall provide a custom web site,
for which Gonzalez shall pay prior to the web site's launch:

      a.      A mortgage website shall cost $5,000; and

      b.      An automotive website shall cost $5,000.

4.      Pricing for new Xtreme products or services or custom products will be
incorporated into this list as they become available.

5.      Pricing of existing products and services per unit:

Automotive mailings:

| | |
|---|---|
| Tube and remote first class | $1.00 |
| Tube and key first class | $ .90 |
| Buyback and key in envelope (4/0 one-sided) | $ .69 |
|     4/4 two-sided | add $ .01 |
| Tear-off | $ .445 |
| Tear-off with Beacon | $ .545 |

Mortgage mailings:

| | |
|---|---|
| FHA tear-off with leads | $ .595 |
| Brian Kennedy with Beacons | $ .545 |
| Brian Kennedy without lists | $ .445 |

8

<u>Extras</u>:

| | |
|---|---|
| Car list | $ .04 |
| Scored credit | $ .10 |
| Renters with credit score | $ .12 |
| Beacon scores | $ .13 |
| Fastrack with bureaus up to 2% | $ .20 ($3.00 per bureau after 2%) |
| Fastrack thank you cards with keys | $ .10 |
| Shopping Sprees | $5.00 |
| Express postage ($.05) and handling ($.02) | $ .07 |

9